IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LA RESOLANA ARCHITECTS, PA.
a New Mexico Corporation,

    Plaintiff,

v.                                                                     No. CIV 05-01017 PJK/RHS

RENO, INC. d/b/a CLAY REALTORS ANGEL
FIRE, a New Mexico Corporation, SOUTHWEST
INVESTMENT TRUST, L.P., a New Mexico
Limited Partnership, LANCE CLAY, GARY
PLANTE, and ANGEL FIRE HOME DESIGN,
a New Mexico Corporation,

    Defendants.

**REQUESTED FINDINGS OF FACT AND
CONCLUSIONS OF LAW OF PLANTE/SW INVESTMENT**

Defendants Gary Plante ("Plante") and Southwest Investment Trust, LP ("SW Investment") (collectively "Plante/SW Investment") submit the following requested findings of fact and conclusions of law as revised following the close of the evidence.

**FINDINGS OF FACT**

**[Plante, Trust Not in Joint Venture]**

1. Plante attended a single meeting at the offices of Preferred Building Systems in December, 1996 for the purpose of gathering information about modular homes for the contemplated subdivision in Angel Fire which later became known as Country Club

Villas ("Villas"). (Note: Plaintiff uses the "Community," Clay "Tract C" to refer to the same development.) [Tr. 838:14-19]

2. At the time of the December 1996 meeting, Plante, Lance Clay and Dan Behles were considering the possibility of perhaps forming a partnership, joint venture or some other form of association to carry out the contemplated Villas subdivision project.

3. Hilchey admitted that he did not know exactly what, if any, role Plante would have in the development of the Villas. [Tr. 133:2-8]

4. Hilchey mistakenly recalls that Plante did most of the talking at the December, 1996 meeting at Preferred Building Systems even though Plante, Lance Clay and Sondra Clay agree that Lance Clay is the one who had worked out what he wanted to build by way of a house plan, which he brought to the meeting. [Tr. 637:15-638:23; 705:10-15; 873:4 – 874:9]

5. Lance Clay learned that the Village would not approve a modular or off-site built structures in March or April, 1997. [Tr. 571:10-22]

6. When Lance Clay reported to Plante that the Village would not allow modular or off-site built structures to be erected in the proposed subdivision, Plante stated to Clay that "we're done", meaning that Plante (and by extension the Trust) no longer wanted to be involved in the development of the Villas. [Tr. 512:16 – 513:12]

7. Plante's decision not to participate with Clay in the development of the Villas was made in 1997 in late March - early April. [Tr. 512:9-15]

2

8. No partnership, joint venture or other type of business was formed or discussed between Lance Clay, Plante or the Trust. [Tr. 826:23 – 827:1]

9. From the time that Plante advised Lance Clay that he was not interested in participating with Clay in the development of the Villas, the only relationship between Clay and Plante or the Trust is the agreement to sell lots to Clay admitted as Exhibit 28. [Tr. 825:14 – 826:1; 828:9-12]

10. Lance Clay confirmed that under the terms of the purchase agreement (Exhibit 28), Plante and the Trust had no right to participate in any profits generated by Clay in the course of developing the Villas subdivision, that Plante and Trust had no right to control the design of the patio homes built in the Villas subdivision, and that Clay did not have the right to make Plante or the Trust assume responsibility for any losses incurred in the development process. [Tr. 547:15-25]

11. Even prior to the early-1997 decision to pass on the Villas subdivision project, Plante had left the design of the patio homes under consideration for the Villas subdivision to Clay as Clay had a clear idea and design of what he thought should be built on the property and what would sell in the real estate market in Angel Fire. [Tr. 471:13 – 472:4]

12. Lance Clay further confirmed that he did not show Plante the plans developed by Hasford as he did not need approval from Plante or the Trust to build the Hasford designed patio house. [Tr. 548:7-11]

13. Plante/SW Investment were not advised by Clay that he had decided to engage Angel Fire Home Design ("Home Design") to draft plans for a site-built patio home

for use in the Villas subdivision. Plante/SW Investment had no knowledge as to whether Clay had used any of the plans drawn by Hilchey to have plans drawn by Home Design, with or without Hilchey's permission. [Tr. 833:17-21]

14. The construction plans drawn by Home Design were never shown to Plante/SW Investment, nor did Clay communicate to Plante that Home Design had even drafted any plans. At no time did Plante/SW Investment have any contact with Home Design ("Home Design") with respect to the floorplan and elevations prepared for the Villas subdivision. [Tr: 548:1-11; 881:5-9]

15. Even if Clay had utilized Hilchey's services, Plante/SW Investment would not have compensated Hilchey as Preferred Building Systems would have placed the architectural fees into their construction pricing. As SW Investment was only selling individual lots to Clay, it would not have been responsible for any of the construction costs. [Tr. 828:13 – 829:3]

16. The deeds admitted as Exhibits 58 through 68 confirm that the Trust was only selling lots to Lance Clay in accordance with the purchase agreement. [Tr. 835:5 – 836:8]

17. The disclosure statement filed of record and admitted into evidence as Exhibit 57 identifies Lance Clay as the "subdivider" of the Villas subdivision and identifies the Trust as the "holder of legal title." The disclosure statement also confirms that the Trust sells to Clay and provides a warranty deed for each lot. Clay then resells the lot with the patio home and provides a warranty deed to the buyer. [Tr. 837:9-13; 837:18 – 838:2]

18. The purchase agreement and the disclosure statement were both signed by Plante in his capacity as the President of Southwest Investment Trust, Inc., which is the general partner in the Trust. [Tr. 836:2-8]

19. At no time during the development did Plante personally visit the Villas subdivision. His first trip to Angel Fire was not until after the filing of the first complaint by plaintiff for copyright infringement. [Tr. 833:2-7]

20. If Lance Clay is unable to complete the Villas subdivision, the Trust will sell lots to another developer or lot purchaser. [Tr. 834:8-12]

21. Plante/SW Investment had no involvement with the process of obtaining the approvals from the Village of Angel Fire and the ACC. [Tr. 548:17-24]

22. Plante/SW Investment made no representations to any third parties as to the source of the design for the Villas patio home, whether or not the design had been prepared by a licensed architect or any other aspect of the quality or nature of the design. [Tr. 825:10-13]

23. Plante/SW Investment did not make any representations (misleading or not) concerning the design for the Villas patio home in connection with the sale, lease, rental or loan of any goods or services or in connection with the extension of credit or the collection of debts. [Tr. 825:7-13]

24. Plante/SW Investment did not use any of the plans drawn by Hilchey or Home Design for any marketing or advertising purpose. [Tr. 825:7-9]

25. Plante/SW Investment have not shared in any gains or profits earned by Clay in the course of the Villas subdivision project. [Tr. 834:21-24]

26. Plante/SW Investment have not been responsible for any losses suffered by Clay in the course of the Villas subdivision project. [Tr. 834:17-20]

27. Plante/SW Investment have not been responsible for any costs associated with the course of the Villas subdivision project. [Tr. 828:21 – 829:3]

28. Plante/SW Investment never possessed the right to control any aspect of the Villas subdivision project aside from the decision to sell lots to Clay. [Tr. 547:21-25; 548

29. No representations were made by Plante/SW Investment that a partnership, or joint venture with Lance Clay existed such that Clay would have any apparent authority to act on behalf of Plante/SW Investment. [Tr. 838:9-13]

**[Hilchey's registered works are derivative of Clay's sketch]**

30. Jones confirmed that Hilchey always took notes at client meetings like the one with Plante and the Clays in December 1996 and that Jones believed that Hilchey took notes at the time of the December 1996 meeting as well. [Tr. 231:14-19]

31. Lance Clay, Sondra Clay, and Plante observed Hilchey taking detailed notes during the December 1996 meeting. [Tr. 488:19 – 489:5; 873:20 – 874:5]

32. Hilchey confirmed that the proposed Villas project was the largest project he had going at the time (early 1997) - which is inconsistent with Hilchey's denial of having made notes of important information during the meeting. [Tr. 190:13-17]

33. Lance Clay made a sketch which included dimensions, room locations, and exterior materials in December 1996 for Hilchey to use when drafting plans similar to the reproduction admitted as Exhibit 56. Lance Clay, Sondra Clay and Plante last saw the sketch at the December 1996 meeting with Hilchey. [Tr:478:9 – 480:12; 484:3 – 485:3; 638:12 – 639:8; 640:15 – 641:22; 843: 7-16; 844:10 – 845:4]

34. Larry Jones, the estimator for Preferred Buildings, recalls that at the December 1996 meeting, people were working across the table on the size and shape of the property and the size and shape of the units to be placed on the property. [Tr. 266:5-9]

35. Larry Jones acknowledged that the working across the table process which he witnessed at the December 1996 could well have included discussion of a sketch or sketches of floor plan similar to the one drawn during the deposition by Lance Clay and admitted as Exhibit 56. [Tr. 245:8-16]

**[No access]**

36. Hilchey admitted that he has no documentary evidence that Exhibits 3, 4, 5 and 10, which do not contain the registered works at issue, were actually received by the persons listed on the cover sheets as the recipients. [Tr. 196:22 – 197:22; 200:17 – 24]

37. Hilchey's testimony that a second meeting between Hilchey, Plante, Lance Clay and Jones at which there was discussion of the marked up floor plan admitted as Exhibit 18 was not confirmed by Jones and refuted by Plante and the Clays. [Tr. 234:7-11; 493:10-15]

38. Even if there was such a second meeting, Hilchey admitted that he has no recollection of when the meeting took place or of giving Plante or Lance Clay any copies of Exhibit 18. [Tr. 98:24 - 99:2;150:10-14; 151:1-3]

39. Exhibits 1-C and 1-D are the subject of U.S. Copyright Registration No. VA 1-257-022 and are the registered works at issue. (These exhibits are the same as Exhibits 19-A and 19-B.) Hilchey admitted (1) that he did not fax Exhibits 1-C or 1-D to Plante or Lance Clay; (2) that he did not hand Exhibits 1-C or 1-D to Plante or Lance Clay; (3) that he did not provide Exhibits 1-C or 1-D to the Preferred Building Systems estimator, Larry Jones. [Tr. 847:24 – 848:14]

40. Plante denies receiving the faxes admitted into evidence as Exhibits 3, 4, 5, 8, 10, 11, 15 or 17. [Tr. 849:1-8]

41. During the early part of 1997 Plante was not going into the Lamb, Metzger law offices to which Exhibits 3, 4, 8, 15 and 17 were ostensibly faxed and had no understanding with that law firm that faxes or mail received there should be forwarded to him. [Tr. 847:24 – 848:14]

42. Hilchey admitted that he has no documentary evidence that the fax to Jones of Exhibit 20 for Jones' use in preparing a quote was actually received by Jones. [Tr. 156:20-25]

43. Jones could not confirm that he forwarded Exhibit 20 or any other specific floorplan to Plante or Lance Clay in connection with a price quote. [234:12-16; 254:20-23; 255: 2-13; 258:4-9]

44. Plante did not receive the floor plan contained in Exhibit 20 from Jones. [Tr. 874:24 – 875:2]

45. Plante did receive a price quote from Preferred Buildings some time after the December 1996 meeting by telephone, which is consistent with Jones's practice of calling potential buyers to follow up on a written price quote if the buyer had not responded. [Tr. 262:7-12; 880:25 – 881:4]

46. Plante did not pass along any drawings from Hilchey or Preferred Buildings to Lance Clay. [Tr. 852:18-25]

**[No Notice of Hilchey's Claim]**

47. Plante did not place a telephone call to Hilchey in the early part of 1998 to discuss the preparation of engineering drawings. [Tr. 845:19 – 846:9; 853:22 – 854:24]

48. From the time of his decision not to continue to participate in the Villas development beyond selling lots to Clay, Plante was without information as to the status of the Village's approval of the subdivision plat or the approval by the Architectural and Environmental Control Committee ("ACC") of the subdivision. [Tr. 852:8-13]

49. Neither the Village nor the ACC had approved the Villas subdivision plat or development plans as of the early part of 1998 and Lance Clay did not tell Plante that such approval had been obtained in that time frame. [Tr. 520:19 – 521:7]

50. Plante did not receive the May 29, 1998 letter admitted as Exhibit 28 in which Hilchey gives notice of his copyrights to the drawings he prepared. [Tr. 854:22 – 855:3]

51. Lance Clay did not obtain the needed approvals from the Village and the ACC until November, 1999. It was only after these approvals had been obtained that Clay commissioned a full set of construction drawings from Hasford. [Tr. 522:2-18]

52. Plante was unaware that Hilchey had been in contact with Dan Behles about site plans. The faxes admitted as Exhibits 8 and 9 indicate that Hilchey was sending some material directly to Behles. Hilchey's response to the request for a redesigned site plan contained in Exhibit 9 is the fax of January 24, 1997 admitted as Exhibit 11. The cover sheet indicates that it was sent to the Behles law office fax number. [Tr. 857:18-25]

53. Behles had no authority to speak on Plante's behalf in connection with the design for the Villas subdivision patio homes or its site plan. [Tr. 858:19-24]

**[Hilchey and Hasford Plans Not Substantially Similar]**

54. Plaintiff's expert Jonathan Siegel confirmed that about one-third of new design clients come into their first meeting with an architect with sketches of what they want. [Tr. 258:12 – 286:1]

55. Siegel confirmed that the more specific the instructions given by a design client to two different designers, the more similarity there would be in the resulting designs. [Tr. 315:10 – 316:19]

56. Lance Clay confirmed that the floor plan admitted as Exhibit 56 closely resembles the sketches which he gave to Hilchey and to Hasford. [Tr. 484:20 – 485:6; 524:4 – 525:18]

57. Lance Clay provided both Hilchey and Hasford with similar specifications, including that the house should be approximately 1,200 square feet in area, that a U-shaped configuration would be used to place two units together with a "zero lot line" between them, that the living room should be on the rear side to maximize the view to the adjacent golf course, that labeled the room sizes and locations, that indicated the exterior materials, and that there should be two bedrooms and two bathrooms. [Tr. 485:7 – 488:7]

58. Lance Clay provided Hasford with additional detailed verbal instructions as to window types and placement, roof type and the configuration of the jut outs he wanted. [Tr. 527:15 – 528:22]

60. Siegel admitted that there were nearly 40 identifiable differences between the Hasford and the Hilchey floor plans. [Tr. 378:19-22]

61. Siegel agreed that there were differences affecting traffic flow between the Hasford and the Hilchey floor plans in the areas of the kitchen, utility/laundry room, and the master bedroom bath. [Tr. 397:1-7]

62. Siegel agreed that the addition of the sunroom on the back side of the house by Hasford would change the look and feel of the rear elevation. [Tr. 403:22 – 404:1]

63. The first floor plan drawn by Hasford for Lance Clay omitted the jut outs because Hasford thought that they were too expensive. Clay had to insist that they be included. [Tr. 528:4-10; 661:22 – 662:10]

64. Hasford also suggested changes be made to the arrangement of the kitchen and guest bathroom as shown on Lance Clay's sketch and Clay approved those changes. [Tr. 528:11-22]

65. Hasford was not given copies of any drawings by Hilchey by Lance Clay or Plante. [Tr. 649:5-7]

66. Hasford did not send any drawings to Plante. [Tr. 649:8-10]

67. Hasford did not see Exhibits 1-C and 1-D until after the first lawsuit for copyright infringement was filed. [Tr. 684:4-18]

**[Itemized Differences]**

68. Hasford identified 12 significant differences between his floor plan, (Exhibit 70, Sheet 5 of 8), and Hilchey's: [Tr. 664:21-676:2]

    i. The areas of the two plans are significantly different. The area of Hilchey's floor plan is 1,188 square feet whereas Hasford's is 1,372 square feet

    ii. In Hasford's plan, the door to the garage opens from the central hall whereas in Hilchey's plan, that door opens from the great room.

    iii. Hasford's plan shows two entries to the kitchen where Hilchey's plan shows only one.

    iv. Hasford's plan shows the guest bathroom in the enter of the house, adjacent to the kitchen, where Hilchey's plan shows it on the wall with the garage, next to the front door.

v.    The door to the guest bedroom in Hasford's plan is off a hallway leading to the kitchen where Hilchey's plan shows that door opening off of the central hallway, opposite the front door.

vi.   Hasford placed the laundry room inside the house, on the wall with the garage where Hilchey placed the washer/dryer in the garage.

vii.  The furnace and water heater are in a utility room on the wall with the garage in Hasford's plan where Hilchey placed them in the interior, next to the kitchen.

viii. Hasford placed the fireplace in the corner of the great room adjacent to the laundry room where it can be seen from both the great room and the dining room where Hilchey placed it in the interior adjacent to the kitchen where it could be seen only from the great room.

ix.   The tub is a distance from the toilet in Hasford's plan for the master bedroom bath where in Hilchey's plan, the two are very close to each other.

x.    Hasford used a flush entry door where Hilchey recessed the door and placed a porch on the exterior.

xi.   The width of the "bump out" in Hasford's plan for the master bedroom is narrower than that shown in the Hilchey plan.

xii.  Hasford's plan includes a sunroom on the rear where Hilchey's plan does not.

69. Defendant's expert, Joseph DellaLonga, identified the same significant differences between the Hasford floor plan and the Hilchey floor plan as items ii, iii, iv, vi, viii, ix, x, xi and xii in the preceding finding. [Tr. 751:17-771:23]

70. In addition, DellaLonga identified the following significant differences between the Hasford floor plan and the Hilchey floor plan:

    i    The roof pitch on the Hasford plan is 5:12 versus a 4:12 pitch on the Hilchey plan. [Tr. 763:12-20]

    ii    The entry way closet in the Hasford plan is next to the door into the garage where Hilchey placed it directly opposite the main entry door. [Tr. 771:24 – 772:9]

    iii    The single wash basin shown in Hasford's plan for the master bath is more practical than the twin wash basins shown in Hilchey's plan. [Tr. 773:12 – 774:18]

    iv    The shape of the living rooms are markedly different on the two plans. [Tr. 820:11-22]

71. The basic concept of a U-shaped arrangement of the two units is not unique and has been commonly used for many years. [5:30 PMr. 819:22-25]

72. Like Siegel, DellaLonga attributes the similarities between the two floor plans to the common specifications and similar sketches provided by Lance Clay to the two designers. [Tr. 818:22 – 819:9]

## CONCLUSIONS OF LAW

1. Plante/SW Investment did not directly infringe on plaintiff's copyrights.

2. Plante/SW Investment did not engage in contributory infringement of plaintiff's copyrights.

3. Plante/SW Investment did not enter into a formal or informal partnership, joint venture or other type of association with Reno, Inc. or Lance Clay to promote, advertise, sell or build the patio homes.

4. Plante/SW Investment has no vicarious liability for the acts of Reno, Inc. or Clay.

5. Plante/SW Investment did not make any representations to any person regarding plaintiff's copyrighted works or the plans drawn by Angel Fire Home Design.

6. Plante/SW Investment did not use plaintiff's copyrighted works to promote, advertise, sell or build the patio homes.

7. Plante/SW Investment did not repackage plaintiff's copyrighted works.

Respectfully submitted,

Attorneys for Defendants Gary Plante and SW Investment Trust, LP

MONTGOMERY & ANDREWS; PA

By: _____
Randy S. Bartell
Jeffrey J. Wechsler
325 Paseo de Peralta
Santa Fe, NM 87501
(505) 986-2504

and

Michael Plante
P.O. Box 67824
Albuquerque, NM 87193
(505) 315-1832

I hereby certify that a copy
of the foregoing pleading
was transmitted by electronic mail
to the following parties on
the 10th day of July, 2006:

Kevin L. Wildenstein, Esq.
9400 Holly Avenue, Bldg. 4, Suite H
Albuquerque, New Mexico 87122
Attorney for Plaintiff La Resolana Architects, P.A.
And Southwest Intellectual Property Services, LLP
klw@swiplaw.com

H. Brook Laskey
Miller Stratvert PA
P.O. Box 25687
Albuquerque, NM 87125
laskey@mstlaw.com

DeWitt M. Morgan
Rodey, Dickason, Sloan, Akin, & Robb PA
P.O. Box 118
Albuquerque, NM 87103-1888
Attorneys for Lance K. Clay and Reno, Inc.,
d/b/a Clay Realtors Angel Fire
mmorgan@rodey.com

By: _____
Randy S. Bartell